**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JOHN FALLARINO JR. TRUST, Derivatively on Behalf of Nominal Defendant PALO ALTO NETWORKS, INC.,

Plaintiff,

v.

NIKESH ARORA, DIPAK GOLECHHA, LEE KLARICH, NIR ZUK, APARNA BAWA, JOHN M. DONOVAN, CARL ESCHENBACH, HELENE D. GAYLE, JAMES J. GOETZ, JOHN KEY, MARY PAT MCCARTHY, LORRAINE TWOHILL,

Defendants,

and

PALO ALTO NETWORKS, INC.,

Nominal Defendant.

C.A. No.

**<u>JURY TRIAL DEMANDED</u>**

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

By and through her undersigned counsel, Plaintiff John Fallarino Jr. Trust ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Palo Alto Networks, Inc. ("Palo Alto Networks" or "Palo Alto" or the "Company") and against certain current and former officers and directors of the Company for (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) unjust enrichment; (iv) abuse of control; (v) gross mismanagement (vi) waste of corporate assets; and (vii) insider selling and misappropriation of information. Plaintiff makes these allegations upon personal knowledge as to those allegations

concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Palo Alto and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Palo Alto's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Schlaegel v. Palo Alto Networks, Inc.*, Case No. 3:24-cv-01156-CRB (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Palo Alto and the Defendants.

## NATURE OF THE ACTION

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant Palo Alto against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately August 21, 2023, to the present (the "Relevant Period").[1]

2. This derivative action concerns a cybersecurity company, Palo Alto Networks, and its executives who were facing serious headwinds—increased competition for their cybersecurity products, with software and hardware being sold by competitors at lower prices, in an environment where demand was slowing due to a variety of factors including increased interest rates and what the Company called "spending fatigue in cyber security." At the start of

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately August 21, 2023, to February 20, 2024, however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

the Relevant Period, Palo Alto's executives began planning a scheme to combat these headwinds, which was to promote a "platformization" strategy in which Palo Alto would attempt to persuade customers to buy all their internet security products from Palo Alto in one package in the hopes that Palo Alto would gain larger market share and combat slowing sales. But the executives knew that for platformization to work, they would need to offer their suite of products to customers for free for a period of time to initially get them onboard. Giving away products for free, even for a limited time, would cause the key metrics Palo Alto promoted to investors to decrease and have a negative short-term impact on the Company.

3. After the close of trading on August 18, 2023, Defendant Nikesh Arora ("Arora"), the Company's Chief Executive Officer ("CEO"), offered investors very bullish revenue and billings growth for Palo Alto for its 2024 fiscal year (which ended July 31, 2024) and discussed platformization with investors, without revealing that the Company was considering a radical shift in its selling strategy – giving away product for free to entice customers to purchase Palo Alto products. Palo Alto's sales slowed during its 2024 First Quarter (which ended October 31, 2023) but Defendants still continued to guide to bullish increases in revenues and billings in its November 15, 2023, call with analysts and investors. Plus, Palo Alto was planning on a significant amount of revenue from a project ("Thunderdome") it was working on for the Department of Defense ("DoD") despite that Arora had been repeatedly told that revenue from this project would take a long time before it would arrive. Revenue from this project "didn't materialize at the pace and at the spending levels" expected in the First Quarter of 2024 and it became apparent that there would be no revenue for the Second Quarter of 2024.

4. But despite slowing demand and the implementation of the new platformization strategy, which was already in the works, and despite the decrease in revenue from the DoD

project, Defendants continued to offer bullish positive statements about Palo Alto's sales, revenue and billing growth and success in platformization. Despite these positive and upbeat statements, Defendant Arora dumped $160 million worth of his own shares in a four-week span from November to December 2023, just two months before Palo Alto would reveal to investors its platformization plan to combat slowing sales and reduction in revenue from the DoD project. When the market finally learned what Palo Alto and its executives knew—shocking analysts who followed the Company, the stock fell 28%, losing over $34 billion in market capitalization in a single day. By selling before the market learned of this give-it-away-for-free strategy, Arora saved himself millions of dollars at the expense of the unknowing investors.

5. Throughout the Relevant Period, Defendants made false and misleading statements and failed to disclose material facts, including that: (1) the Company's consolidation and platformization initiatives were not driving increased market share; (2) customer demand for the Company's products was slowing due to increased competition and lower pricing from competitors, so the Company was planning to modify its strategy to offer free product as part of its platformization strategy in an effort to increase sales which would reduce short-term revenue and billings; (3) new artificial intelligence ("AI") offerings were not facilitating greater platformization and consolidation; (4) the Company's "Thunderdome" contract with the Department of Defense would not generate revenue in the short term; and (5) for these reasons, Defendants lacked a reasonable basis for their positive statements about customer demand, billings, and platformization, as well as related financial results, growth, and prospects.

6. The Relevant Period begins on August 21, 2023, the first day of trading after Palo Alto provided guidance for its upcoming fiscal year 2024 ("FY 2024"), which began on August 1, 2023. On August 18, 2023, after the close of trading, the Company provided guidance for FY

2024, projecting total billings of $10.9 billion to $11.0 billion, for a year-over-year growth in billings of 19% to 20% up from Fiscal Year 2023 billings of $9.2 billion. Palo Alto also projected revenue of $8.15 billion to $8.20 billion, for year-over-year growth of 18% to 19%, compared to its total revenue of $6.9 billion in 2023.

7. The Company defines "billings" as "total revenue plus the change in total deferred revenue, net of acquired deferred revenue, during the period." In other words, billings represent both revenue actually received in a period, as well as additions to the Company's deferred revenue balance.

8. Billings, as Palo Alto explained in SEC filings, is a "key metric" which provides "investors with an important indicator of the health and visibility of our business because it includes subscription and support revenue, which is recognized ratably over the contractual service period, and product revenue, which is recognized at the time of hardware shipment or delivery of software license…"

9. During a conference call with analysts and investors on August 18, 2023, to discuss Palo Alto's results and guidance for 2024, Defendant Arora said that "platformization is continuing to drive large deal momentum." Platformization is the Company's strategy that was supposed to drive growth, which was being facilitated by new offerings imbued with AI technology. "Platformization" was effectively a means of bundling multiple Palo Alto security products into a single deal. Customers traditionally used multiple vendors for different security functions. Palo Alto's platformization approach allowed those customers to terminate other vendors and consolidate their security operations around Palo Alto's platform offerings. Defendants claimed this consolidation would "deliver superior security outcomes" for customers and that therefore the "strategy is resonating with a growing number of our customers."

10. After announcing First Quarter 2024 financial results, during a call with analysts and investors on November 15, 2023, Defendant Arora said "on the product side, we've had one of the strongest starts to our fiscal year." He also claimed that Palo Alto "continue[d] to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey." Palo Alto did lower its 2024 year-over-year growth in billings to $10.7 billion to $10.8 billion, or 16% to 17% growth, but year-over-year growth in revenue was projected to continue to be between $8.15 billion and $8.2 billion, or 18% to 19% growth.

11. As discussed, however, former Palo Alto employees said that customers were resistant to buying Palo Alto's suite of products via platformization. Palo Alto's competitors, Orca Security and Wiz, Inc., priced their products at much lower prices than Palo Alto, and some of their products were of higher quality. Additionally, many customers did not want all their software with one company and, as a result, Palo Alto had a difficult time competing with selling certain of its products to these customers. Also, customers were slowing their purchases of security software due to increased interest rates, which led to slowing sales growth for Palo Alto. As a result, Defendants began to implement a strategy of offering products for free as part of its platformization strategy in the hopes of winning more business from customers. Offering free products, however, would negatively impact Palo Alto's short-term revenue and would mean that Palo Alto would not achieve the guidance it informed investors about on August 18, 2024. Defendant Arora admitted that the Company "quietly" began to develop its free product offering strategy in or around August 2024.

12. Additionally, for Fiscal 2024, Palo Alto was expecting significant revenue from a project it was working on for DoD, believed to be project Thunderdome, and Palo Alto included expected revenue in its 2024 guidance to investors. Defendant Arora subsequently admitted that

revenue from a “large [federal] program” did not “materialize” at the expected pace in the First Quarter of 2024 and “did not show up” in the Second Quarter of 2024, making Palo Alto’s revenue and billings guidance false and misleading.

13. In the four weeks between November 22, 2023, and December 12, 2023, during Palo Alto’s Fiscal Second Quarter, Defendant Arora sold approximately $160 million of his Palo Alto common stock. These stock sales were out-of-line with his prior stock sales, as with one exception in June 2023, he had never sold more than 60,000 shares of stock in any given month since the Company went public in 2012. Whereas from November to December 2023, Defendant Arora sold over 555,000 shares. These stock sales came just two months before Palo Alto announced it was reducing revenue guidance for the second half of 2024, which it blamed on its “new” strategy of giving product to customers for free as part of its platformization strategy and that revenue from a large DoD project did not come in the Second Quarter.

14. After the market closed on February 20, 2024, Palo Alto announced its financial results for the second quarter of 2024 and lowered its third quarter and full-year billings and revenue guidance, with expected billings growth in Third Quarter 2024 of just 2-4% and Fiscal Year 2024 billings growth of 10% to 11%, dramatically below the 19% to 20% it guided in August 2023 and the 16% to 17% guided in November 2023. Palo Alto reduced its guidance for year-over-year total revenue growth from the 18% to 19% guided in August and November 2023 to between 15-16%. In an earnings call on the same day, Defendant Arora explained that “our guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership.”

15. This announcement revealed what was essentially a complete overhaul of Palo Alto’s growth strategy, which Defendants claimed was to respond to the realities customers face

while trying to switch from several individual tools to a consolidated security platform. To circumvent this roadblock to gaining new customers, Palo Alto's new strategy would instead allow customers to use its products free of charge until their contracts with other security vendors expired. Defendant Arora admitted the strategy overhaul had been "quietly" in the works for the past six months, *i.e.*, since the start of the Relevant Period.

16. If Palo Alto's strategy was working, and if as Defendant Arora said on November 15, 2023, Palo Alto had, "on the product side," "one of the strongest starts to our fiscal year" there would have been no need to dramatically overhaul the Company's platformization strategy to give away products for free. Contrary to their Relevant Period statements, however, Palo Alto's platforms did not have an advantage over competitors that would allow them to continue gaining market share.

17. Analysts expressed surprise at the strategic pivot to discounts. Barclays called the decision to offer free product to customers while their legacy contracts with other vendors were still in effect "the part of the [earnings] call that was most unexpected" and questioned why Palo Alto would announce "this big of a change … unexpectedly in the middle of the year." Barclays estimated the move accounted for $600 million of the cut to FY 2024 billings. Guggenheim analysts wrote a note similarly questioning why Palo Alto would announce the "major change" on a quarterly earnings call rather than "at their Friday night call in August" 2023, six months earlier (*i.e.*, at the start of the Relevant Period).

18. Defendant Arora also revealed on February 20, 2024, that U.S. federal government deals for several large projects did not close and resulted in "a significant shortfall in our U.S. federal government business" that the Company expected to continue into the third and fourth quarters of 2024. Defendant Arora further claimed, "[t]he situation started off towards the

end of Q1 were worsened in Q2." This shortfall was largely caused by the Thunderdome project for the DoD, to which Palo Alto was a sub-participant with Booz Allen Hamilton.

19. On this news, the price of Palo Alto common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024, to close at $261.97 on February 21, 2024. This was the largest single-day drop Palo Alto had suffered since going public in 2012.

20. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, the Company and investors have suffered significant losses and damages.

## JURISDICTION

21. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

23. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

### A. Plaintiff

24. Plaintiff has been a shareholder since prior to the start of the Relevant Period, is currently, and at all relevant times has been, a holder of Palo Alto common stock.

**B. Nominal Defendant**

25. Nominal Defendant Palo Alto is incorporated in Delaware and its current principal executive offices are located at 3000 Tannery Way, Santa Clara, California, 95054. The Company's common stock trades on the NASDAQ under the ticker symbol "PANW."

**C. Defendants**

26. Defendant Arora has been the Company's CEO and Chairman of the Board (the "Board") since June 2018. Defendant Arora is also a member of the Board's Corporate Development Committee. For the fiscal years of 2023 and 2024, Defendant Arora received $151,425,203 and $58,036,875 in total compensation, respectively.[2] Defendant Arora is named as a defendant in the Related Securities Action.

27. Defendant Dipak Golechha ("Golechha") has been the Company's Chief Financial Officer ("CFO") since 2020. For the fiscal years of 2023 and 2024, Defendant Golechha received $9,381,668 and $14,624,157 in total compensation, respectively. Defendant Golechha is named as a defendant in the Related Securities Action.

28. Defendant Lee Klarich ("Klarich") has been the Company's Chief Product Officer ("CPO") since 2017. For the fiscal years of 2023 and 2024, Defendant Klarich received $17,092,370 and $20,338,318 in total compensation, respectively. Defendant Klarich is named as a defendant in the Related Securities Action.

29. Defendants Arora, Golechha and Klarich are collectively referred to herein as the "Securities Action Defendants."

30. Defendant Nir Zuk ("Zuk") is the Company's Co-Founder and has been the Company's Chief Technology Officer ("CTO") and member of the Board since March 2005. For

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

the fiscal years of 2023 and 2024, Defendant Zuk received $8,086,212 and $12,302,179 in total compensation, respectively.

31. Defendant Aparna Bawa ("Bawa") has been a member of the Company's Board since May 2021. Defendant Bawa is a member of the Board's Audit Committee, the Compensation and People Committee, the Corporate Development Committee, and the Security Committee. For the fiscal years of 2023 and 2024, Defendant Bawa received $356,383 and $427,506 in total compensation, respectively.

32. Defendant John M. Donovan ("Donovan") has been a member of the Company's Board since September 2012. Defendant Donovan is the Chair of the Corporate Development Committee, the Governance and Sustainability Committee, and the Security Committee, and is a member of the Board's Compensation and People Committee. For the fiscal years of 2023 and 2024, Defendant Donovan received $413,931 and $477,622 in total compensation, respectively.

33. Defendant Carl Eschenbach ("Eschenbach") has been a member of the Company's Board since May 2013. Defendant Eschenbach is a member of the Board's Security Committee. For the fiscal years of 2023 and 2024, Defendant Eschenbach received $337,254 and $388,698 in total compensation, respectively.

34. Defendant Helene D. Gayle ("Gayle") has been a member of the Company's Board since May 2021. Defendant Gayle is a member of the Board's Governance and Sustainability Committee and the Security Committee. For the fiscal years of 2023 and 2024, Defendant Gayle received $346,738 and $399,699 in total compensation, respectively.

35. Defendant James J. Goetz ("Goetz") has been a member of the Company's Board since April 2005. Defendant Goetz is a member of the Board's Audit Committee, the Corporate

Development Committee, and the Security Committee. Defendant Goetz received no compensation for his role as a member of the Board for the fiscal years of 2023 and 2024.

36. Defendant John Key ("Key") has been a member of the Company's Board since April 2019. Defendant Key is the Chair of the Board's Compensation and People Committee. Defendant Key is also a member of the Board's Audit Committee and Security Committee. For the fiscal years of 2023 and 2024, Defendant Key received $380,335 and $438,507 in total compensation, respectively.

37. Defendant Mary Pat McCarthy ("McCarthy") has been a member of the Company's Board since October 2016. Defendant McCarthy is the Chair of the Board's Audit Committee. Defendant McCarthy is also a member of the Board's Corporate Development Committee and the Security Committee. For the fiscal years of 2023 and 2024, Defendant McCarthy received $370,850 and $427,506 in total compensation, respectively.

38. Defendant Lorraine Twohill ("Twohill") has been a member of the Company's Board since April 2019. Defendant Twohill is a member of the Board's Governance and Sustainability Committee as well as the Board's Security Committee. For the fiscal years of 2023 and 2024, Defendant Twohill received $361,045 and $405,199 in total compensation.

39. Defendants Arora, Bawa, Donovan, Eschenbach, Gayle, Goetz, Key, McCarthy, Twohill, and Zuk are collectively referred to herein as the "Director Defendants."

40. The Director Defendants, along with Defendants Golechha and Klarich, are collectively referred to herein as the "Individual Defendants."

41. The Individual Defendants, along with Palo Alto are collectively referred to herein as the "Defendants."

**D. Related Party Non-Defendants**

42. Ralph Hamers ("Hamers") has been a member of the Company's Board since February 2025. Hamers is named solely for the purposes of demand futility.

43. Helle Thorning-Schmidt ("Thorning-Schmidt") has been a member of the Company's Board since February 2025. Thorning-Schmidt is named solely for the purposes of demand futility.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44. By reason of their positions as officers, directors, and/or fiduciaries of Palo Alto, and because of their ability to control the business and corporate affairs of Palo Alto, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Palo Alto in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Palo Alto and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45. Each director and officer of the Company owes to Palo Alto and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

46. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

47. Pursuant to the Audit Committee Charter of Palo Alto (updated as of May 16, 2024)[3], the purpose of the Audit Committee is to:

> Assist the Board of Directors in fulfilling its responsibilities for generally overseeing:
>
> The Company's accounting and financial reporting processes and internal controls as well as the audit and integrity of the Company's financial statements;
>
> The qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditor");
>
> - The performance of the Company's internal audit function;
> - The Company's Compliance with the applicable law (including U.S. federal securities laws and other legal and regulatory requirements);
> - Risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

48. Concerning the Company's quarterly financial statements, the Audit Committee Charter sets forth the following responsibilities:

> The Audit Committee shall review and discuss the following with management, the Company's internal auditors (the "internal auditors"), if applicable, and the independent auditor, as applicable:
>
> - The scope, timing and approach, as well as the materiality thresholds for, of the annual audit of the Company's financial statements.
> - The Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.
> - The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on

---

[3] Available at https://investors.paloaltonetworks.com/static-files/68522bb0-3154-473a-a366-413821d2f007

the annual financial statements, including any critical accounting matters (CAMs) identified in the auditor's report.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.
- Major matters regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles. The Audit Committee shall consider the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles.
- Analyses prepared by management or the independent auditor setting forth significant financial reporting matters and judgments made in connection with the preparation of the financial statements.
- The effect of regulatory requirements and accounting pronouncements on the Company's financial statements.
- Any significant changes required or taken in the audit plan as a result of any material control deficiency.
- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information and management's response.
- Any significant disagreements between management and the independent auditor.

49. Concerning legal and regulatory compliance, the Audit Committee Charter sets forth the following responsibilities:

> The Audit Committee shall oversee and discuss, as needed, with management, the internal auditors and the independent auditor: (i) the overall adequacy and effectiveness of the Company's ethical compliance programs, including (but not limited to) the Company's Code of Business Conduct and Ethics (except to the extent related to conflicts of interest, which is subject to the oversight of the Governance and Sustainability Committee of the Board); and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs (including compliance with the Foreign Corrupt Practices Act, foreign anticorruption laws and export control regulations) in each case to the extent pertaining to financial, accounting and/or tax matters. The Audit Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies, including any comment letters issued by the

> SEC with respect to the Company's public filings and any published reports that raise material issues regarding the Company's financial statements or accounting policies. The Audit Committee shall discuss with the Company's general counsel legal matters that may have a material impact on the financial statements.

50. Concerning review of earnings press releases and earnings guidance, the Audit Committee Charter states:

> The Audit Committee shall review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to the public, analysts and ratings agencies. To the extent practical, the Audit Committee will review, in advance, the script for any earnings or finance-related conference calls to be held for the benefit of the public, analysts and ratings agencies.

51. Concerning oversight of the Company's internal controls, the Audit Committee Charter states:

> The Audit Committee shall review and discuss with management, the internal auditors and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors or management; any remediation plan or special audit steps adopted in light of significant control deficiencies; and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

52. Concerning disclosure controls and procedures, the Audit Committee Charter states:

> The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures, including in respect of financial reporting and material environmental, social and governance disclosures (such as disclosures contained in the Company's annual and quarterly reports on Form 10-K and Form 10-Q, proxy statements and financial releases).

53. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and

materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

54. The Individual Defendants, as officers and/or directors of Palo Alto, were also bound by the Company's Code of Business Conduct and Ethics (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Palo Alto, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

55. Regarding maintenance of the Company's books and records, the Code states:

> We must always be transparent and present information about our Company – including our financial statements – completely, accurately, timely, and in accordance with the law in reports and documents that the Company files with government agencies or releases to the general public. We have controls and procedures in place to assist us in meeting our financial reporting requirements, including timely notifying senior management of material information, and we take compliance with these requirements very seriously.
>
> We never accept falsification of Company documents, inaccurate submissions of expenses, undocumented side agreements, or maintenance of any off-book accounts. We create business records as part of our daily work, and we are all responsible for managing our business records in accordance with our Company policies and the laws and regulations applicable to our business. All business records, whether revenue forecasts, business agreements, or simple requests for reimbursement of travel expenses, must be accurate and complete.

56. Concerning public sector compliance, the Code states that:

> Palo Alto Networks is a proud provider of products and services to governments around the world. Government procurement laws, rules, and regulations are often complex and can vary widely between jurisdictions. When we are involved in supporting and facilitating public sector business, we must understand and comply with applicable laws, regulations, and government contract requirements. We always take every reasonable measure to protect all information against unauthorized disclosure.

---

[4] Available at https://www.paloaltonetworks.com/content/dam/pan/en_US/assets/pdf/legal/code-of-business-conduct-and-ethics-2020.pdf

57. Regarding Insider Trading, the Code States that:

> Insider trading occurs when someone who has material nonpublic or inside information about our Company or other companies buys or sells securities or enables others to do so, benefitting from inside information they have that the market does not. Not only is insider trading unfair – it is also illegal. We must follow all relevant laws and regulations prohibiting insider trading and recognize that it is unlawful to buy or sell securities based on inside information. It is also against the law and our Company policy to "tip" or share information with anyone who may trade on that information.
>
> Never buy or sell securities based on material nonpublic information. (This includes information about Palo Alto Networks and any third parties with whom we do business.)

58. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

59. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Palo Alto, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Palo Alto.

60. Because of their advisory, executive, managerial, and directorial positions with Palo Alto, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Palo Alto.

61. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Palo Alto and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

62. To discharge their duties, the officers and directors of Palo Alto were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Palo Alto were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Palo Alto conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Palo Alto was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

63. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Palo Alto and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Palo

Alto, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Palo Alto, the absence of good faith on their part, and a reckless disregard for their duties to Palo Alto and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Palo Alto.

64. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

65. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Palo Alto has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

67. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

68. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

69. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

71. Palo Alto is a global cybersecurity company that purports to provide platforms and services to help secure enterprise users, networks, clouds, and endpoints. The Company focuses on four fundamental areas: network security, cloud security, security operations, and Unit 42 to provide threat intelligence and security consulting.

72. In addition to stand-alone products, Palo Alto offers bundles of products in unified "Platforms." Palo Alto's platform offerings include: (1) Strata – its network security platform which purports to combine firewalls with AI models and other products, (2) Prisma Cloud – its cloud security platform which also uses AI-powered applications, and (3) Cortex – its Security Operations platform which combines XPANSE, XSOAR, XDR, and XSIAM to automate security operations functions.

73. Palo Alto advertises a wide range of capabilities in its platforms: a) **Network Security**: Palo Alto's network security platform includes hardware and software firewalls and cloud-delivered Secure Access Service Edge ("SASE"), which uses Prisma Access, the Company's Security Services Edge ("SSE") solution and Prisma SD-WAN. Palo Alto's network security platform also includes cloud-delivered security services as add-ons. Strata Cloud Manager is a "network security management solution," that "can centrally manage our network security platform irrespective of form factor, location, or scale." b) **Cloud Security**: Prisma Cloud is marketed as a comprehensive Cloud Native Application Protection Platform ("CNAPP") that secures multi- and hybrid-cloud environments for applications, data, generative AI ("GenAI") ecosystem, and the entire cloud native technology stack across the development lifecycle. The Company also offers VM-Series and CN-Series virtual firewalls for inline network security on multi- and hybrid-cloud environments. c) **Security Operations**: Cortex is marketed as combining security analytics, endpoint security, automation, and attack surface management ("ASM") solutions through its products delivered as software as a service ("SaaS") or software subscriptions. These products include Cortex XSIAM, which is advertised as the "AI security automation platform for the modern SOC [Security Operations Center], harnessing the power of AI to radically improve security outcomes and transform security operations." The platform also

includes Cortex XDR for the prevention, detection, and response to complex cybersecurity attacks, Cortex XSOAR for security orchestration, automation, and response ("SOAR"), and Cortex Xpanse for ASM.

74. The product for which Palo Alto is most known is its firewall – a product which helps filter traffic between devices to prevent users from accessing harmful websites and to keep malicious actors from accessing an organization's network.

75. After the Company's initial success in its firewall business, it later expanded into cloud security (Prisma Cloud) and security operations (Cortex) to target a new generation of customers. To form its Prisma Cloud and Cortex businesses, Palo Alto spent over $4 billion on mergers and acquisitions of 17 companies since 2017. As the use of cloud-distributed applications and remote work increases, the cloud business is expected to continue to eclipse traditional firewall security. Palo Alto's firewall products, which once comprised over 90% of the Company's revenue, now comprise about 60%.

76. In general, M&A activity is strong across the cybersecurity industry and allows incumbents with existing distribution channels to simply plug new products and features into their existing systems. Palo Alto has grown to significantly expand the number of products it offers over the past decade, including over 23 products across the three categories of network, security operations, and cloud, in addition to its Unit 42 threat management and administration across each of those areas. However, as a result of this expansion and lack of proper integration, Palo Alto's platforms became fragmented, featuring disjointed products, which can lead to poor security outcomes. This was a major concern for customers and placed the Company at a competitive disadvantage.

**The Company's "Platformization" Strategy**

77. Before and during the Relevant Period, Palo Alto represented that it was implementing a strategy called "platformization" which aimed to consolidate its various security solutions into a unified platform. Historically, Palo Alto's customers obtained different security products and services a la carte from different vendors. Palo Alto embarked on a platformization strategy to bring various security functions under one roof, thereby capturing more business from its competitors. As Defendant Arora explained in September 2024, "[customers] need an integrated solution where all the services are provided from one platform," rather than being "fragmented" across various vendors.

78. To entice customers to consolidate, Palo Alto stated that "patching together" technology from multiple vendors is no longer sufficient, and that their platform approach offers a better solution that is simpler, more comprehensive and scalable, and more effective. On the other hand, there is often no added value in consolidating network, endpoint, and cloud security with the same vendor. Because they involve completely different technologies, simply combining them does not necessarily add any improvement for the customer and can instead result in diminished versions of one or all of the security products.

79. Contrary to Defendants' claims, however, larger platforms can actually be less efficient and create issues such as increased technical debt, poor support channels, difficulty with implementation, and increased expenses for unused features. The more embedded large platforms become in customers' workflows and covering larger areas, the more power the platform vendor, like Palo Alto, has over the buyer as it becomes harder to switch to a different vendor. In addition, large platforms that cover a large scope of areas can also introduce more vulnerabilities. It can be easier for bad actors to focus on poking holes in a single tool to unlock all doors, with catastrophic insecurities resulting from a single failure point in a large platform.

80. FE 2,[5] a vice president in Palo Alto's sales department at all times during the Relevant Period, said that Palo Alto's sales were slowing in the last few months of 2023. FE 2 said, of offering product for free, that "if you look at the timing of when that came up, in that quarter, our numbers weren't very good. [Arora] could have said, 'more customers are buying more from us and it's taking a longer time,' but that wouldn't have been very appealing to the Street for its stock price." FE 2 confirmed that platformization was not truly a new sales strategy in the sense that Palo Alto had previously "bundled" products together. Offering free products as part of the platformization approach, however, was new.

81. FE 2 explained that customers were taking a longer time to sign contracts, and before signing were insisting that Palo Alto run its system within the customers' own environment so the customers could see its operations for themselves, using their own data. This slowed the sales process down. Yet despite this slowing in sales, Defendants consistently represented that consolidation and platformization efforts were continuing to drive growth, including Defendant Arora's statement on November 29, 2023, that "our platformization continues to get us more and more share."

82. FE 2 also stated that sales goals were arrived at in consultation with both FE 2 and the executive team, including Arora. Arora, according to FE 2, was very aggressive with sales goals, having high expectations and being hands-on.

---

[5] FE 2 was employed by Palo Alto from mid-2021 through the end of the Relevant Period as a Vice President of sales. FE 2 sold Prisma Access and Prisma SD-WAN. FE 2's business unit accounted for approximately 10% of Palo Alto's overall sales. FE 2's managers reported, in turn, to Defendant Arora. The sales goals for FE 2's business were arrived at by both FE 2 and Palo Alto's senior executives. Defendant Arora led quarterly business review meetings which FE 2 attended, and these meetings discussed growth numbers for FE 2's group. Growth numbers were quarterly business review meetings that FE 2 attended, and that Defendant Arora led. At these meetings, Arora would cite a sales number that FE 2's business was generating.

83. Defendants' decision to start offering products for free further demonstrates that platformization was not resonating with customers. Implementing free giveaways was a risky and aggressive strategy that would necessarily result in lower revenue and billings growth in at least the following 12 months. There was also the chance that customers would engage in the free trials offered by Palo Alto but later decide not to commit in the long-term, meaning the strategy would not have the desired effect of accelerating the consumption of Palo Alto's products and helping the company take lasting market share from competitors. These risks would not have been necessary if platformization and consolidation had been progressing as Defendants represented to investors throughout the Relevant Period.

**Platformization Did Not Address Difficulties in Palo Alto's Federal Government Business**

84. Throughout the Relevant Period, Defendants touted the impact of plaformization on large deals, including Defendant Arora's statement on August 18, 2023, that "[o]ur platformization is continuing to drive large deal momentum." Those large deals were mainly comprised of federal government contracts, which made up the majority of Palo Alto's billing revenue.

85. FE 5,[6] who sold Palo Altos' Prisma Cloud products to federal government customers including the DoD, recalled that although the Company pushed "platformization" during the Relevant Period, in fact Palo Alto had always offered customers a way to add additional products onto their platforms. "It's always been that way. It's no secret," FE 5 explained. Platformization was "just a buzzword."

[6] FE 5 was employed by Palo Alto from mid-2022 through the end of the Relevant Period as a sales specialist in Cloud Security. FE 5 sold the Company's Prisma Cloud products to federal clients, specifically the Department of Defense and its contractors.

86. FE 5 elaborated that once an existing customer chose to add a product to its plan, "then we restructure [the deal] and you get a bigger bang for your buck. It's already integrated." Platformization in practice meant that more products were offered for the same amount of money, or that one product was offered for a discount, as if the Company were selling "a $1.25 pencil for $1."

87. FE 5 attended the Company's annual sales meeting in Las Vegas from August 20-24, 2023. There, Company sales executives announced to the gathered sales staff the new strategy to aggressively promote platformization to both commercial and federal customers. FE 5 and the other sales representatives were taken aback. According to FE 5, "we all knew about platformization, and we knew it wouldn't work [for federal customers]. But we wanted to feed our families and were told to sell the idea."

88. One problem in particular FE 5 and FE 1[7] highlighted was the lack of security certifications Palo Alto's products had. Sales representatives selling cloud security products to federal customers had to show the products had adequate authorizations under the Federal Risk and Authorization Management Program ("FedRAMP"). Without FedRAMP authorization at the "High Impact Level," which is reserved for the federal government's most sensitive data, the DoD "couldn't touch certain [Palo Alto] products," according to FE 5. Unfortunately, many of Palo Alto's products did not have certification at the FedRAMP "High Impact Level," so they could not be sold or included in a platform sold to the DoD, including Cortex and Prisma Cloud.

89. FE 5 recalled that, at the August 2023 annual sales meeting, one of FE 5's colleagues asked the executives leading the meetings how sales representatives could sell Prisma

[7] FE 1 was employed by Palo Alto from mid-2021 through the end of the Relevant Period. From mid-2022 through the end of the Relevant Period, FE 1 oversaw sales of Prisma Cloud to enterprise customers as a district sales manager.

Cloud to federal customers without the FedRAMP "High" designation. The executives responded: "You make the sales happen; we'll make that happen faster."

90. However, according to FE 1, the FedRAMP certification process can take 12 to 18 months. FE 1 agreed that Prisma Cloud was not completely FedRAMP certified and agreed that the DoD could only buy products which were either certified or whose certification was "in progress."

91. Part of FE 5's responsibilities included creating projections for how many "credits" customers would use in the coming year "based on business secured" from a customer already. FE 5 and other sales representatives would share these projections with either the district sales manager or vice president of the public sector of Prisma Cloud, who would say he "would take it to the bosses." Because these projections were based on existing sales, which were drying up after the company's strategic shift to push platformization, FE 5 recalled "he got a clear understanding at those meetings that we weren't selling [much]."

92. Exacerbating the problems, Congress repeatedly failed to pass a full spending package for fiscal year 2024 (which began on October 1, 2023) until March 2024. The federal agencies who were FE 5's customers told FE 5 that the lack of an approved federal budget left them without funds for cybersecurity projects, so they could not expand their contracts with Palo Alto. According to FE 5, who sold specifically to DoD and DoD contractors, the "U.S. government didn't have the budget for cybersecurity projects" until well after the Relevant Period, in the summer of 2024.

93. One of the most significant federal government deals during the Relevant Period was the Thunderdome project, a large 5-year, $1.86 billion initiative (awarded to Booz Allen Hamilton with Palo Alto as a sub-participant) developed by the Defense Information Systems

Agency ("DISA") to modernize the DoD's network security architecture by implementing zero trust. Zero trust is a strategic approach to cybersecurity that assumes networks are already compromised and continuously validates every stage of a digital interaction.

94. One of the main components of the Thunderdome prototype was SASE, which included Palo Alto's Prisma service. Prior to the start of the Relevant Period, on March 7, 2023, Defendant Arora hyped Palo Alto's SASE business to investors, stating, "Our SASE pipeline is the largest... The U.S. government announced Zero Trust initiative last week. They said Thunder doom [dome] was approved by Department of Defense, the SASE project. There's going to be a lot of SASE."

95. As Arora previously stated, Thunderdome was part of the SASE pipeline, yet he failed to disclose that this deal was facing major pitfalls, was also not solidified beyond short-term milestones, and would not meaningfully contribute to billings or revenue in the first half of fiscal year 2024. Platformization and consolidation did nothing to address the key issues with Thunderdome and Palo Alto's other government deals.

**Palo Alto's New AI Products Had No Impact on Customer Consolidation of Platformization**

96. In the face of rapid new developments in AI across the industry, Defendants also represented that new AI initiatives were contributing to both platformization and zero trust, with Defendant Arora stating in November 2023, that "[w]e launched an AI-enabled cloud manager in network security to continue our consolidation and platformization efforts towards Zero Trust." Earlier, in August 2023, he told investors that Palo Alto was "uniquely positioned in the industry" to be able to deliver AI-based outcomes to customers.

97. Defendant Arora advertised XSIAM, one of the Company's AI initiatives in security operations, as providing opportunities in platformization, stating, "[w]e continue to drive

platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM." In November 2023, Defendant Klarich further touted the progress of XSIAM and the greater potential in harnessing AI to benefit the Company, highlighting "very strong" interest from customers fueled by its AI technology and automation for the "fastest sort of growth of a new product that we've ever seen."

98. In reality, Palo Alto's AI initiatives were not driving platformization to a significant degree and would not meaningfully contribute to sustaining Palo Alto's revenue growth. FE 3[8] stated that when XSIAM was rolled out, approximately four months before FE 3 left in November 2023, it was "not ready for prime time." FE 3 made this comment because they had an opportunity to test it out with a number of customers, and the customers "couldn't get full functionality" on XSIAM.

99. According to FE 2, the process of selling XSAIM also took longer than other products. This is because Palo Alto's licensing contracts specified fees based on the volume of data that fed into Cortex XSIAM. As stated by FE 2, customers interested in XSIAM did not realize how much data they truly had. Prisma generated logs that fed into XSIAM, and FE 2's group charged on a per-user basis. The proposals given to customers before contracts were signed were therefore complex, since the Company was transparent about identifying each line-item charge. Customers typically had questions about each charge, which made the process take longer than if the proposal simply presented a package number.

[8] FE 3 was employed as an Enterprise Account Manager by Palo Alto from mid-2022 to November 2023.

100. FE 6[9] described similar difficulties. During the weekly sales meetings, FE 6 did not hear about anyone on their sales team, or any other team, having sold the XSIAM platform. For FE 6's market, although XSIAM was "extremely interesting," it was too expensive. "I didn't sell a single XSIAM product." For FE 6, this was frustrating; the product was "pushed for everyone" to sell in every territory and every market.

101. FE 3 further explained that a product like XSIAM is "so complex, it takes a while to flesh it out. You have to connect log files, applications, provide the reporting and the integration of the environment." Nevertheless, FE 3 said that XSIAM was "rushed out" because "they were late" in introducing XSIAM. "A lot of it was customer demand: 'Why don't you have a SIEM like XSIAM?'" FE 3 said. "You gotta to compete with the IBMs."

**Palo Alto's Decision to Implement Free Giveaways was in Response to Industry Competition**

102. While Palo Alto continued to tout its platformization progress, it was facing intense competitive pressure from cybersecurity-focused peers, including Orca Security ("Orca") and Wiz, Inc. ("Wiz"), both of which specialize in cloud security. Orca actively competes with Palo Alto's Prisma Cloud product, stating that Palo Alto's user interface puts together "different, standalone" products "stitched together" from seven different acquisitions to form Prisma Cloud, while Orca offers a "single, comprehensive" cloud security platform.

103. Wiz also competes with Prisma Cloud, similarly, stating that its "more unified platform" gives a "notable advantage" over Palo Alto. Wiz claims that Prisma Cloud is "offered to customers in a more modularized manner compared to Wiz, meaning they have fewer core modules as standard" which is "probably a result of the extensive M&A executed by Nikesh

---

[9] FE 6 was a Regional Sales Manager at Palo Alto from mid-2019 through the end of the Relevant Period. FE 6 sold to enterprise and commercial customers.

Arora and his leadership team." Both Orca and Wiz provide extensive public materials arguing that Palo Alto's products fall short of offering a worthwhile, unified platform.

104. FE 4[10] confirmed that selling Prisma, in particular, was a challenge. This was because "competitors priced their product three times less." The competitors he was referring to were Orca and Wiz, which "were giving away their products."

105. FE 1 confirmed that there was heavy competition and ultimately decided to leave Palo Alto in large part because trying to sell cloud services against rival Wiz was "brutal."

106. Palo Alto also faced competition from companies such as CrowdStrike, Zscaler, Cloudflare, and Microsoft, which were boosting their cybersecurity businesses with expanded AI capabilities.

107. In November 2023, Microsoft unveiled a new generative AI solution, Microsoft Security Copilot, also advertised as built on the principles of zero trust, to create a "flywheel of protection to change the asymmetry of the digital threat landscape[.]" Cloudfare partnered with Microsoft and other companies to improve its GPU-powered infrastructure, and it also augmented its Workers platform with AI capabilities by November 2023. CrowdStrike revealed a new generative AI cybersecurity tool called Charlotte AI in May 2023, followed by another AI and automation-based tool, Falcon for IT, in September 2023. In June 2023, Zscaler announced generative AI-powered tools, including Security Autopilot, Zscaler Navigator, and data loss prevention offerings. Later in November 2023, Zscaler announced that it hired an AI leadership team, including chief AI officer and executive vice president for data and AI platforms.

108. These and other similar innovations were direct competitors for Palo Alto's own AI products during the Relevant Period, including Cortex XSIAM, which were aiming to address

---

[10] FE 4 was employed by Palo Alto as a sales manager to enterprise customers from early 2022 through the end of the Relevant Period for Prisma and Cortex.

the challenge of leveraging massive data sets for security organizations and to maximize threat responses.

109. Despite representing to investors that there was "strong demand in the market," "strong interest across our next-generation security portfolio," and that "platformization is continuing to drive large deal momentum," Palo Alto Networks was struggling to compete in a competitive environment.

**Defendant's Materially False and Misleading Statements and Omissions**

110. On Friday, August 18, 2023, after trading in the stock market closed, Palo Alto announced its financial results for its fiscal 2023 fourth quarter ("Q4 2023"). In the lead-up to the earnings release, analysts questioned the unusual Friday night timing Palo Alto chose. Wedbush analysts called the decision to hold a Friday-night earnings call a "Disaster Timing Move For the Ages," and wrote: "We have seen many strange things in our 23 years covering the tech sector on the Street and thought we have seen it all until Palo Alto decided to host a 'head scratching' Friday August after the close conference call this Friday to discuss its earnings and medium term guidance." Wedbush further explained that Palo Alto "needs to grow Billings ~19% y/y in FY24E to ~$11b" to justify its current valuation because its stock was already "pricing in almost a 'best-case' scenario for FY24E numbers."

111. On August 18, 2023, Palo Alto Networks issued a press release, filed as an exhibit to a Form 8-K with the SEC ("August 18, 2023, 8-K"), quoting Defendants Arora and Golechha:

> "***We finished off the year with strong execution and the changing environment drove more customers towards platformization***," said Nikesh Arora, chairman and CEO of Palo Alto Networks. "***Our strategy is resonating with a growing number of our customers, driving continued consolidation, to deliver superior security outcomes***. We were delighted with the reception in the market for our AI based security automation platform, XSIAM."

> "Our top-line strength showed through in our remaining performance obligation and next-generation security ARR. ***Our billings this quarter didn't fully capture that strength***. We continue to make great progress in our financial transformation," said Dipak Golechha, chief financial officer of Palo Alto Networks. "Our operating margins increased by more than 500 basis points for the year as we continued to focus on profitability."

112. The italicized statements referenced above were materially misleading and omitted to disclose material facts when made. By August 2023, Palo Alto's platformization "strategy" was not working and not resonating with customers. In fact, customers were hesitant to adopt platformization and Palo Alto Networks' competitors were offering lower prices. In response to slowing sales, the Company started to "quietly" develop platformization sales programs that would offer customers substantial up-front discounts, amounting to, on average, approximately six-months of free products while their contracts with Palo Alto Networks' competitors expired, to entice them to purchase Palo Alto products. The Company's projected 2024 billings and revenue growth was not achievable. Offering lengthy periods of free product would negatively impact the Company's billings and revenue. Despite Defendants' assurances that platformization was being well received by customers, the Company was about to drastically change its strategy which required it to take a billings hit that would take an estimated 12-18 months to recover from. Moreover, many of the Company's products could not be combined and sold to federal agencies because they did not have the requisite FedRAMP certifications.

113. The August 18, 2023, 8-K also provided guidance for the upcoming quarter and fiscal year:

> For the fiscal year 2024, we expect:
>
> • ***Total billings in the range of $10.9 billion to $11.0 billion, representing year-over-year growth of between 19% and 20%.***
>
> • ***Total revenue in the range of $8.15 billion to $8.20 billion, representing year-over-year growth of 18% and 19%.***

• ***Diluted non-GAAP net income per share in the range of $5.27 to $5.40, representing year-over-year growth of 19% and 22%.***

• ***Adjusted free cash flow margin in the range of 37% to 38%.***

114. The italicized statements identified above were materially misleading and omitted material facts when made. First, for the reasons explained herein, Palo Alto's billings growth was unsustainable. The Company had already begun to develop for a new sales strategy for platformization in response to slowing sales which involved offering approximately 6-months of free product to customers. This strategy would necessarily cause a hit to billings in FY 2024 lasting approximately 12-18 months and would therefore require Palo Alto Networks to cut approximately $600 million from its billings outlook. Second, another approximately $600 million of Palo Alto Networks' billings guidance for Fiscal Year 2024 was attributable to the federal Thunderdome project, which was not materializing. As FE 5 affirmed, DoD did not have the funds to spend on cybersecurity until months after the Relevant Period.

115. Also on August 18, 2023, Palo Alto Networks held an earnings call about its reported Q4 2023 financial results ("Q4 2023 Earnings Call"). On the Q4 2023 Earnings Call, Defendant Arora discussed the Company's platformization initiative, stating:

> This quarter, we added more new ARR than any other pure-play cybersecurity company. ***Our platformization is continuing to drive large deal momentum***. One way to illustrate the traction of our next-generation security capability across network security, cloud security and SOC automation, so look at the makeup of some of our largest deals.

* * *

> ***We continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM***. We continued with our go-to-market transformation. For example, we consolidated our SASE sales team into our core a year ago, and we had a strong outcome, as you saw, with some large transactions and opportunities across the pipeline.

116. The italicized statements referenced above were materially misleading and omitted material facts when made for the reasons explained herein. Palo Alto's platformization strategy was not resonating with customers and the Company had already begun to plan for a new sales strategy for platformization which would require it to take a hit to its billings that would negatively impact the Company for 12-18 months. Arora's statement that "platformization is continuing to drive large momentum deals" was materially misleading as it was not driving "large momentum deals," which would include deals with the federal government, and it omitted to reveal that the Company's platformization strategy began to change. Palo Alto had begun to plan a strategic shift to offering products to customers for free, which, while it could result in more deals, would result in less short-term revenue for Palo Alto and make achieving its projected billings and revenue growth unattainable.

117. Palo Alto also acknowledged during the August 18, 2023, Q4 2023 Earnings Call that the Company was increasingly offering "deferred payment terms" to customers. Arora explained that the "rising cost of money," *i.e.* rising interest rates, had "caused customers to hold on to their cash" and seek to pay more often on deferred payment terms, such as annual billing plans. Arora later explained that the Company had an option between offering steep discounts to customers and simply allowing them to pay at later points in time, so deferred payments were Palo Alto's preferred choice:

> [I]nterest rates are higher. CFOs are scrutinizing deals, which means you have to be better prepared to answer their question and show the business value that you bring to them with your cybersecurity products. We are lucky that we have been focusing on our platform strategy.
>
> So we can usually walk in and say, here, you can consolidate the following 5, it doesn't cost you anymore, but you get a better outcome and you get a modernized security infrastructure. So from that perspective, that strategy of ours is resonating. But there is more scrutiny. There are deals that go through multiple levels.

> There are some that get pushed. There are some that get canceled. And again, you just have to get more on the top of the funnel. And as Dipak very clearly highlighted that eventually end up and there's a conversation about saying, wait, I used to pay you upfront. And I need to understand the cost of money. ***And is there a way, either my cost has to be lower from you, so I can sort of account for the cost of money or you've going to allow me to pay you later. From a deferred plan perspective, those are really the 2 effects***.

118. The italicized statements referenced above were materially misleading and omitted material facts because by August 2023, Palo Alto's approach to selling customers platformization packages was not working. The Company began "quietly" adjusting its platformization strategy to offer customers substantial up-front discounts rather than just deferred payment terms and Arora omitted to reveal this material fact. As Arora admitted on February 20, 2024, the cost of money was not the only sticking point for prospective platformization customers. Palo Alto Networks' competitors were lowering prices in an effort to retain customers and platformization was not the attractive alternative Palo Alto Networks described it as being. The Company found it would be necessary to offer lengthy periods of free product to customers while their legacy contracts with other vendors for various point products expired to get customers to leave their current security vendors and adopt Palo Alto's platform approach. These "discount[s]" or "free offer[s]," as Arora put it in February 2024, would mean "about 6 months' worth of free product capabilities to our customers" and would impact the Company's billings for 12-18 months. Accordingly, while Defendants were assuring investors that Palo Alto could avoid offering discount by allowing customers to pay substantially in full on a deferred basis, the Company was already planning to offer significant discounts to induce customers to adopt platformization.

119. On September 1, 2023, Palo Alto Networks filed its annual report for fiscal year 2023, ended July 31, 2023, with the SEC on Form 10-K ("2023 10-K"). Defendants Arora and

Golechha signed the 2023 10-K. The 2023 10-K warned that a portion of Palo Alto's revenue "is generated by sales to government entities, which are subject to a number of challenges and risks."

> Sales to government entities are subject to a number of risks. ***Selling to government entities can be highly competitive, expensive, and time-consuming, often requiring significant upfront time and expense without any assurance that these efforts will generate a sale***. The substantial majority of our sales to date to government entities have been made indirectly through our channel partners. ***Government certification requirements for products and subscriptions like ours may change, thereby restricting our ability to sell into the federal government sector until we have attained the revised certification. If our products and subscriptions are late in achieving or fail to achieve compliance with these certifications and standards, or our competitors achieve compliance with these certifications and standards, we may be disqualified from selling our products, subscriptions, and support offerings to such governmental entity, or be at a competitive disadvantage, which would harm our business, operating results, and financial condition.*** Government demand and payment for our products, subscriptions, and support offerings may be impacted by government shutdowns, public sector budgetary cycles, contracting requirements, and funding authorizations, with funding reductions or delays adversely affecting public sector demand for our products, subscriptions, and support offerings. Government entities may have statutory, contractual, or other legal rights to terminate contracts with our distributors and resellers for convenience or due to a default, and any such termination may adversely impact our future operating results. Governments routinely investigate and audit government contractors' administrative processes, and any unfavorable audit could result in the government refusing to continue buying our products, subscriptions, and support offerings, a reduction of revenue, or fines or civil or criminal liability if the audit uncovers improper or illegal activities, which could adversely impact our operating results in a material way. Additionally, the U.S. government may require certain of the products that it purchases to be manufactured in the United States and other relatively high-cost manufacturing locations, and we may not manufacture all products in locations that meet such requirements, affecting our ability to sell these products, subscriptions, and support offerings to the U.S. government.

120. The italicized statements referenced above were materially misleading and omitted material facts when made for the reasons identified herein. Additionally, as FE 5 and FE 1 attested, Palo Alto's products lacked adequate FedRAMP certifications already. It was misleading to warn that it was only if certification requirements "change" that the Company

would need to "attain[] the revised certification" when the Company largely lacked the certifications already and it could take 12-18 months to obtain them. The Company was already at the competitive disadvantage it warned about. Moreover, while the 2023 10-K presented in hypothetical terms the risk that sales to the government could take time without generating revenue, in fact Palo Alto's Thunderdome deal had failed to close and was already failing to generate revenue. At the close of the Relevant Period, Palo Alto would revise its 2024 billings guidance downwards by approximately $600 million because of the failure of the federal Thunderdome deal to close.

121. During a September 7, 2023, conference call, Arora fielded a question from Goldman Sachs analyst Gabriela Borges regarding Palo Alto Networks' FY 2024 fiscal planning and how customer purchases were being impacted by the cost of money:

> <u>Gabriella Borges Goldman Sachs Group, Inc.:</u>
>
> [M]y question to you is, how did the fiscal '24 process planning compare to fiscal year '23? Are there are 1 or 2 things that stood out to you? I know you've talked about how cost of capital is impacting customer purchases. What was different this year?
>
> <u>Defendant Arora:</u>
>
> I think customers and companies are still absorbing the change in behavior. I think the idea that money was free for 10 years, you walk up to a customer and saying, here's a 3-year deal. And the guy said, oh, what do you want me to pay you for 3 years, $10 million? Yes, I need $10 million now. Well, give me a discount, here's 5%. No problem, $10 million here, like I'm making 25 basis points in my treasury. Now the guy is making 500 basis points on treasury. He wants a 15% to 20% discount to pay your cash upfront. Suddenly, people understand the cost of money. ***So suddenly, you have a choice. You can take the 20% discount, take a hit on bookings and revenue or you can take payments every year.*** That changes all the math that all the wonderful analysts are used to tracking. And they're all like trying to figure out, is demand going away. ***Well, demand is there. Cybersecurity demand is growing. It's a secular demand. It's not cyclical.*** People are getting more petrified. The attackers are moving faster. The plant of cybersecurity has been chronically underinvested in.

> ***We're just absorbing that change in customer behavior. Demand is not changing. Its execution is shifting***.

122. Defendant Arora's italicized statements referenced above were materially misleading for the reasons identified herein. As FE 2 recounted, Palo Alto Networks was experiencing slowing sales in the final months of 2023 and the "numbers weren't very good" that quarter. FE 5 agreed that Palo Alto Networks' sales representatives knew platformization "wouldn't work" and were reporting in monthly meetings that they were not selling much product. Palo Alto's competitors, meanwhile, were offering customers lower prices; three times lower in the case of Prisma according to FE 4. Despite Arora's assurances that Palo Alto was offering deferred payment plans instead of discounts and "demand is there," the Company was actively planning a shift in strategy to use steep discounts, amounting to approximately 6-months-worth of free product, to entice customers to replace their legacy patchworks of security vendors with Palo Alto's platforms.

123. Later in the September 7, 2023, conference call, in response to an analyst's question about key takeaways from the sales kickoff, Defendant Arora responded:

> We're now pivoting to demonstrate the value of integration. For 5 years, people didn't believe that integrated products need to exist in security. ***Now they're beginning to -- sort of beginning -- many of our customers, they'd much rather have integration because not having the integration hasn't made their breaches stop or hasn't made bad actors go away. So they're beginning to understand the value of integration.***

124. Defendant Arora's italicized statements referenced above were materially misleading for the reasons identified herein. As recounted by FE 1 and FE 4, Palo Alto was facing difficulties selling against competitors such as Orca and Wiz, which offered more unified and integrated platforms. Defendant Arora's assurances that customers would "rather have integration" and were "beginning to understand the value of integration" was misleading because

customers were not in fact responding to Palo Alto's "integration" or platformization. The Company was actively planning a shift in strategy to offer approximately 6-months-worth of free product, to entice customers to replace their legacy patchworks of security vendors with Palo Altos' platforms.

125. Defendant Arora further stated, in response to an analyst's question about "selling the Palo Alto platform versus the point products" and "how do you go about converting or bringing over more SIs over to the platform approach?":

> Now the moment they get in the build and operate mode, they actually don't want to deploy 17 products. They don't deploy one because it's more sort of efficient it is for them to deploy one product, the more profitable possibly it is for them, the less error prone it is, the less amount of skills they need to learn 17 different products and deploy them.
>
> ***So it actually is a good thing for them to partner with a single vendor on multiple certain lanes as opposed to multiple vendors as long as the products are good and they will meet the requirements of the customer***. So that is a prerequisite. You can't go with bad products and security because they work together. You have to have a good product. ***So I think it's a proposition, they're -- they continue to warm up to.*** There are some of them like Deloitte just launched an SSDL called secure software double life cycle. The whole thing is on Prisma Cloud and train their entire sales force on how do we go do better software development and make it secure. And the way you do it is by using Prisma Cloud as part of the underlying sort of the product solution because eventually, the customer is looking how do I deploy this in my environment.
>
> ***So we deploy Prisma Cloud, and that's how you get a secure software at the life cycle***...

126. Defendant Arora's italicized statements referenced above were materially misleading for the reasons identified herein. In touting the benefits of partnering with a single vendor and representing that customers were continuing to "warm up to" Palo Alto's platform consolidation approach, Defendant Arora mislead investors about the true strength of platformization. Platformization was failing to drive growth and the Company was experiencing

slowing sales. The Company had already begun to plan to shift from its failed strategy of selling customers on the benefits of platformization to offering them free product.

127. On October 27, 2023, On June 14, 2023, the Company filed its annual proxy statement with the SEC (the "2023 Proxy"), which was solicited by Defendants Arora, Zuk, Bawa, Donovan, Eschenbach, Goetz, Key, McCarthy and Twohill.

128. The 2023 Proxy solicited shareholders to approve, among others: (i) re-elect Defendants Arora, Bawa, Eschenbach, and Twohill to the Board; (ii) ratify the appointment of Ernst & Young LLP as the Company's independent registered accounting firm for the fiscal year ending July 31, 2024; (iii) approve, on an advisory basis, the compensation of the Company's named executive officers; and (iv) approve an amendment to the 2021 Palo Alto Equity Incentive Plan to increase the number of plan shares reserved for issuance.

129. In addition, the 2023 Proxy represented that the Company had adequate risk oversight functions that were being exercised by the Board. Specifically, the 2023 Proxy states:

> Risk is inherent with every business, including strategic, financial, business and operational, legal and compliance, and reputational. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks our Company faces, while our Board, as a whole and assisted by its committees, has responsibility for the oversight of risk management. ***In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed***.
>
> Our Board believes that open communication between management and our Board is essential for effective risk management and oversight.
>
> While ***our Board is ultimately responsible for risk oversight***, our Board committees assist our Board in fulfilling its oversight responsibilities in certain areas of risk.

130. However, in reality, these assertions were false and/or misleading, as Defendants were not conducting proper risk oversight, as they were causing the Company to issue the false and misleading statements described herein.

131. Specifically, the 2023 Proxy failed to disclose to investors: (1) the Company's consolidation and platformization initiatives were not driving increased market share; (2) customer demand for the Company's products was slowing due to increased competition and lower pricing from competitors, so the Company was planning to modify its strategy to offer free product as part of its platformization strategy in an effort to increase sales which would reduce short-term revenue and billings; (3) new artificial intelligence ("AI") offerings were not facilitating greater platformization and consolidation; (4) the Company's "Thunderdome" contract with the Department of Defense would not generate revenue in the short term; and (5) for these reasons, Defendants lacked a reasonable basis for their positive statements about customer demand, billings, and platformization, as well as related financial results, growth, and prospects.

132. On November 15, 2023, Palo Alto Networks issued a press release announcing its financial results for the first quarter of fiscal 2024, filed with the SEC on Form 8-K ("November 15, 2023 8-K"). The press release quoted Defendants Arora and Golechha:

> "An unprecedented level of attacks is fueling strong demand in the cybersecurity market," said Nikesh Arora, chairman and CEO of Palo Alto Networks. "***We continue to execute on platformization as customers recognize the benefits we can provide in simplifying security architectures and driving better security outcomes***."
>
> "Our revenue, next-generation security ARR, and cRPO metrics best represent our top-line performance in Q1, while ***our billings were impacted by the cost of money***," said Dipak Golechha, chief financial officer of Palo Alto Networks. "Our record cash flow generation and strong Q1 non-GAAP operating margin, illustrate our commitment to driving profitable growth.

133. The italicized statements identified above were materially misleading and omitted to state material information for the reasons identified herein. It was misleading to suggest that platformization was resonating with customers and attribute the billings reduction to the "cost of money." In fact, platformization was not selling itself organically on the strength of its supposed benefits. The promises of "simplifying security architectures and driving better security outcomes" were not enticing customers to leave their legacy vendors. The cost of money was not the only culprit for customers' hesitance to adopt platformization, and offering deferred payment terms or financing was not enough. The Company was experiencing slowing sales and had already begun to plan to shift from its failed strategy of selling customers on the benefits of platformization to offering them free product.

134. The November 15, 2023, 8-K also provided guidance for the second quarter of 2024 ("Q2 2024") and full fiscal year 2024. The Company revealed that it anticipated lower billings growth (15-18%) in Q2 2024 as compared to Q1 2024 (17-19%). The Company also lowered its fiscal year 2024 guidance for billings ($10.7 billion to $10.8 billion) and billings growth (16-17%) from the figures projected in Q1 2024 ($10.9 billion to $11.0 billion and 19-20%):

> For the fiscal year 2024, we expect:
>
> • ***Total billings in the range of $10.7 billion to $10.8 billion, representing year-over-year growth of between 16% and 17%.***
>
> • ***Total revenue in the range of $8.15 billion to $8.20 billion, representing year-over-year growth of between 18% and 19%.***

135. The italicized statements referenced above were materially misleading and omitted material facts for the reasons identified herein. By November 2023, Palo Alto was months into planning a strategic shift in its platformization sales strategy that would include

offering customers free products. This strategy would make the revenue figures Palo Alto guided to in the November 15, 2023, 8-K overstated by approximately $600 million. Second, another $600 million worth of the projected billings were comprised of the Thunderdome project, which was failing to materialize, making the projected billings and revenue projections false and misleading.

136. Defendant Arora further stated on the Q1 2024 Earnings Call:

> ***I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute.*** The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business.
>
> ***We continue to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey.*** I'll highlight a few deals to talk about the diversity of opportunity, cross-platform buys as well as the geographical distribution of our deals.

137. The italicized statements referenced above were materially misleading and omitted material facts for the reasons identified herein. Platformization was not resonating with customers, and the Company was months into planning a pivot in strategy to offer large discounts because platformization's supposed benefits were not enticing customers on their own. Contrary to Arora's representations that he was "not concerned about the demand for cybersecurity" and "we continue to see strong interest," the Company was in fact experiencing issues with customer demand for its products. As stated by FE 1 and FE 4, Palo Alto was struggling to sell against competitors. Additionally, the Company was struggling to make sales to federal agencies, whose resources were constrained during the Relevant Period.

138. Later, on the Q1 2023 Earnings Call, Defendant Arora stated: "***Customers who invest in our platform by deploying all 3 form factors continue to grow rapidly, up 34%.*** Of our top 100 network security customers, 60% have purchased all 3 form factors, up from 53% a year

ago. On average, these platform customers spend more than 15x of the rest of our network security customer spend."

139. The statements referenced above were materially misleading and omitted material facts. Contrary to Arora's representations that consolidation across platforms continued to "grow rapidly," platformization was not a sustainable source of growth and was not resonating with customers. Sales were slowing to the point that Palo Alto was already planning a major pivot in strategy which would have a large negative impact on its business.

140. Defendant Arora further touted Palo Alto's platformization efforts related to Prisma Cloud on the Q1 2024 Earnings Call, stating:

> Moving on to Prisma Cloud. ***We continue to see a strong endorsement of our integrated platform strategy. This traction is evident in the strong growth of our multi-module customers. We have seen particular success here with modules released over the last 2.5 years***. There has been a consistent pattern of seeing 100-plus customers for new modules in the first full quarter of launch and rapid growth after that as the benefits of these new modules are broadly understood. ***This enthusiastic adoption has driven our strong conviction in adding key new modules, including some through acquisitions.***

141. The italicized statements referenced above were materially misleading and omitted material facts. The Company's platform strategy was not seeing a "strong endorsement" and "traction" as Arora represented. Rather, "adding key new modules" through acquisitions put Prisma Cloud at a disadvantage compared to competitors that were offering a more unified product. The Company's platformization was not resonating with customers and the Company was months into planning a pivot in strategy to offer large discounts.

142. In response to an analyst's question about the XSIAM pipeline, Defendant Klarich stated:

> ***Yes, were -- look, we've obviously over the last few quarters talked about XSIAM, and the interest we're seeing from customers is very strong. And it's been the fastest sort of growth of a new product that we've ever seen***. I think it

> speaks to a couple of things. One is just the need in the market from customers to go through the SOC transformation. Nikesh talked about the speed of attacks increasing relative to disclosure requirements and things like that. And obviously, the number of attacks simply going up as well. ***That's driving the technology need to have a different solution, a better solution, one driven by AI and automation. And that's exactly how XSIAM was built, and that is what's fueling the interest***.
>
> ***The second part of this is with XSIAM, we're able to replace several of the customers' legacy point solutions in the SOC. So we are consolidating multiple independent piece parts with a single XSIAM deployment. And third, with each deployment of XSIAM, this is a significant investment the customer is making in us. So it would vary with those [ investments ] for 3-year investments, in some cases, even longer, because they are standardizing their SOC on a new platform. They want that long-term runway with us. This is not a short-term decision they're making. So all of those factors are what are fueling the strong pipeline that we shared and the early customer success we're having with XSIAM.***

143. The italicized statements referenced above were materially misleading and omitted material facts. Contrary to Klarich's statements, customers were not seeing platformization's benefits as natural selling points. Sales were slowing to the point that the Company was already planning a major pivot in strategy which would have a large negative impact on its business. Additionally, customers were underwhelmed with Palo Alto Networks' AI products.

144. During the Q1 2024 Earnings Call, Defendant Arora also addressed deferred billing:

> In Q1, the cost of money remained a constant discussion and customers' significant focus on this topic is becoming the new normal. ***The way it manifests itself in our business is that there's always a payment and duration discussion in final renegotiations. Given our strong balance sheet, we can use a mix of strategies to navigate the environment. This includes annual billing plans, financing through PANFS [Palo Alto Networks Financial Services] and partner financing.*** Whilst ***this does not impact our business demand or impact to annual revenue or annual metrics, it does create variability on total billings more than before, depending on financing use or the duration of contracts***.

> I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute. ***The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business***.

145. The italicized statements identified above were materially misleading. Defendant Arora's assurances that the "cost of money" was the primary friction for customers considering platformization and could be addressed through a "mix of strategies" including "annul billing plans, financing through PANFS and partner financing," which would only have a "cosmetic impact" on Palo Alto's business and no real "impact" on "annual revenue," was materially misleading and failed to disclose information known to Defendants. In fact, Palo Alto by this point had been planning for months to make a strategic shift in its platformization efforts to offer steep discounts to customers, including approximately 6-months of free products, to induce them to switch from their legacy vendors to Palo Alto's platforms. Giving products away for free, unlike deferred payment terms and financing, would have more than a "cosmetic impact" on Palo Alto's finances.

146. Later during the Q1 2024 Earnings Call, an analyst revisited the issue of the "higher cost of money" and asked how Palo Alto management had "thought about factors like pipeline, like close rates and very importantly, billings duration for the rest of the year, as we just try to get comfortable with how much that billings guide has maybe been de-risked." Defendant Arora replied:

> I think repetition doesn't spoil the prayer, so I will repeat. The billings difference is not a change in demand for us or not a function of our pipeline. The billings change is a consequence of negotiations with customers. ***When the customer says, you want me to pay you for 3 years upfront? You got to give me a bigger discount. Do you want to pay me -- do you want me to do a 3-year deal? You got to go finance it with PANFS. Now I could do that.***

> ***But I could say, just pay me on an annual basis. I'm okay. I'll collect my money every year. If I go in that direction, my billings changes. It does not change anything in my pipeline, in my close rates or in my demand function. Do you see my point?***
>
> So we're just keeping -- giving ourselves flexibility because this quarter, we saw a lot more negotiations around those topics. ***We just don't want to be held hostage to those kind of negotiations***, where we have to go finance deals to get TCV in that because billings is a TCV metric. TCV is important if I'm concerned about churn. I have very low churn across my product category.
>
> ***I'm very happy to collect my money on an annualized basis if that's what's needed to make sure that I don't get pressure on financing, I don't get pressure on having to give larger discounts.*** I retain flexibility. I do a lot of TCV teams. I do a lot of financing. But this allows me the flexibility. So I want to make sure is there is no change in demand function in the market. ***There is no change in our revenue forecast***.

147. Later, during the same call, in response to another analyst question, Defendant Arora reiterated: "As I said, the demand function is not going down for cybersecurity across the board. ***The only thing that's changing is people say, I'll do a 2-year, 1-year deal or a 3-year deal or a 5-year deal. I'll pay you later. You finance it around year-over-year. That's the only confusion you're seeing.***"

148. The italicized statements identified above were materially misleading and omitted material facts. Despite Defendant Arora claiming Palo Alto Networks was using deferred payment terms as an alternative to discounts and did not want to be "held hostage" to those types of customer negotiations, in fact the Company had found its platformization strategy was not working and had been planning for months to offer prospective customers large discounts to make it more palatable to switch to Palo Alto Networks' platforms.

149. During the same Q1 2024 Earnings Call, Defendant Arora touted the SASE business, stating in response to an analyst question: "In terms of SASE, as I said, we're -- we compete with a different set of people, not with the hardware people. ***We saw 60% growth this***

***quarter. And we have visibility on the pipeline for the rest of the year, which gives us comfort that there is business to be had there***."

150. The italicized statements referenced above were materially misleading and omitted material facts. In touting 60% growth and stating that "we have visibility on the pipeline for the rest of the year," Defendant Arora omitted the uncertainties about Thunderdome, the key government SASE deal.

151. Defendant Golechha also addressed the use of discounts and deferred payment terms to entice new customers, but assured investors that there was strong demand in the market and that Palo Alto Networks had a strong financial position and flexibility:

> Before turning to guidance, I want to frame some of the impacts that we're seeing on our billings. As Nikesh noted, ***we see strong demand in the market and continue to see customers make a technical selection of offerings across our portfolio. From here, we see more customers asking for deferred payment terms either with annual billings, financing through PANFS or pursuing external financing. Some customers are looking for additional discounts for upfront payments as they grapple with the cost of money. Our strong financial position, which includes $7 billion in cash, cash equivalents and investments, combined with our many options in dealing with this dynamic, gives us significant flexibility. This can impact our billings trends quarter-to-quarter, and we're reducing our billings guidance to account for this through the fiscal year 2024***.

152. Defendant Golechha's italicized statements referenced above were materially misleading and omitted material facts. Although Golechha emphasized Palo Alto Networks' ability to use deferred payment terms and PANFS as the Company's primary means of reducing friction in sales, in fact the company was experiencing slowing sales and was months into planning a strategic shift to using discounts and free products to facilitate deals.

153. On November 17, 2023, Palo Alto filed its quarterly report for the period ended October 31, 2023, with the SEC on Form 10-Q ("1Q 2024 10-Q"). The 1Q 2024 10-Q also

warned, in hypothetical terms, that "[a] portion of" Palo Alto's "revenue is generated by sales to government entities, which are subject to a number of challenges and risks."

> Sales to government entities are subject to a number of risks. ***Selling to government entities can be highly competitive, expensive, and time-consuming, often requiring significant upfront time and expense without any assurance that these efforts will generate a sale***. The substantial majority of our sales to date to government entities have been made indirectly through our channel partners. ***Government certification requirements for products and subscriptions like ours may change, thereby restricting our ability to sell into the federal government sector until we have attained the revised certification. If our products and subscriptions are late in achieving or fail to achieve compliance with these certifications and standards, or our competitors achieve compliance with these certifications and standards, we may be disqualified from selling our products, subscriptions, and support offerings to such governmental entity, or be at a competitive disadvantage, which would harm our business, operating results, and financial condition***. ***Government demand and payment for our products, subscriptions, and support offerings may be impacted by government shutdowns, public sector budgetary cycles, contracting requirements, and funding authorizations, with funding reductions or delays adversely affecting public sector demand for our products, subscriptions, and support offerings***. Government entities may have statutory, contractual, or other legal rights to terminate contracts with our distributors and resellers for convenience or due to a default, and any such termination may adversely impact our future operating results. Governments routinely investigate and audit government contractors' administrative processes, and any unfavorable audit could result in the government refusing to continue buying our products, subscriptions, and support offerings, a reduction of revenue, or fines or civil or criminal liability if the audit uncovers improper or illegal activities, which could adversely impact our operating results in a material way. Additionally, the U.S. government may require certain of the products that it purchases to be manufactured in the United States and other relatively high-cost manufacturing locations, and we may not manufacture all products in locations that meet such requirements, affecting our ability to sell these products, subscriptions, and support offerings to the U.S. government.

154. The italicized statements referenced above were materially misleading and omitted material facts. As FE 5 and FE 1 attested, Palo Alto products lacked adequate FedRAMP certifications already. It was misleading to warn that it was only if certification requirements "change" that the Company would need to "attain[] the revised certification" when the Company largely lacked the certifications already and it could take 12-18 months to obtain them. FE 5 also

confirmed that Palo Alto was struggling to make sales to federal customers because the delay in the "budgetary cycles" and "funding authorizations" had already deprived federal agencies of the funds to engage in broader deals with Palo Alto. Moreover, while the 1Q 2024 10-Q presented in hypothetical terms the risk that sales to the government could take time without generating revenue, in fact Palo Alto's Thunderdome deal was already failing to generate revenue. Palo Alto would revise its 2024 billings guidance downwards by approximately $600 million because of the failure of the federal Thunderdome deal to close.

155. During a conference call on November 29, 2023, in response to an analyst's question about the competitive environment, Defendant Arora stated:

> The way I think about competition, remember, 5 years ago, we had 1.5% market share of $180 billion market. We're probably at 3.5% now, which means 96% of the time, somebody else has got the business. This -- I live happily with competition. It's great. It's wonderful, drives more innovation. ***Our platformization continues to get us more and more share.*** The more people that are in the market, the more innovation there is, the more they could tell customers and saying, listen, you should move to SASE.

156. The italicized statements referenced above were materially misleading and omitted material facts when made for the reasons identified herein. Platformization was not allowing the Company to gain "more and more share." Palo Alto's sales were slowing, and in order to secure the "business" Arora referred to, the Company was planning to offer significant discounts which would negatively impact billings.

157. On the same call, in response to an analyst's question about AI, Defendant Arora stated: "I think 12 to 18 months we will see copilots in most products. I think the question will become, ***how do I deal with so many copilots because you have 40 security vendors, you have 40 security copilots now. I'd deal with them. So then that goes back and reinforces the theme***

***of consolidation, platformization***. And then the question is, can every small start-up afford to build a security product and a copilot next to it."

158. The italicized statements referenced above were materially misleading and omitted material facts. Additionally, Palo Alto's AI initiatives were not meaningfully contributing to Palo Alto's revenue growth. FE 2 stated that selling XSAIM took longer than selling other products, and FE 6 did not hear about anyone on their sales team, or any other team, having sold the XSIAM platform. FE 3 recalled that when Palo Alto's XSIAM AI product was rolled out in mid-2023, customers who had the opportunity to test it reported that they "couldn't get full functionality" from XSIAM. FE 3 further explained that XSIAM was "rushed out" because Palo Alto was "late" in bringing AI initiatives to market and felt it had to put out an AI product to "compete" with other companies. Platformization was failing to drive growth in the face of heavy competition and the Company was experiencing slowing sales. Palo Alto was not in a position to "deal with" competitors on consolidation but had instead already begun to plan to shift from its failed strategy and start offering customers free product.

159. Later, on the November 29, 2023, conference call, in response to an analyst's question related to market share and AI, Defendant Arora stated:

> ***So we're trying to make sure that we can sell more things to the same customer, which is good for them, by the way, because it gives them consolidation from a platform perspective. We'll give them a better security outcome***. It's a better business for us. So from that perspective, I don't look at these things as individual streams that I got to go sell individually, a lot of them. I look at collectively how can I give a platform to a customer, which gets them to a better security outcome, and they make Palo Alto a big trusted partner. ***I think there's tons of room out there in the market to do that.***

160. The italicized statements referenced above were materially misleading and omitted material facts. Contrary to Arora's representations, Palo Alto's platformization efforts did not resonate with customers. There was not "tons of room" in the market to consolidate

customers. Rather, sales were slowing to the point that Palo Alto was already planning a major pivot in strategy which would have a large negative impact on its business.

**Palo Alto's Risk Warnings Were Inadequate**

161. The 2023 10-K and 1Q 2024 10-Q described, in hypothetical terms, the risk facing the Company if it failed to "accurately predict, prepare for, and respond promptly to rapidly evolving technological and market developments and ***successfully manage product and subscription introductions and transitions*** to meet changing end-customer needs in the enterprise security industry, our competitive position and prospects will be harmed."

> The enterprise security industry has grown quickly and continues to evolve rapidly. Moreover, many of our end-customers operate in markets characterized by rapidly changing technologies and business plans, which require them to add numerous network access points and adapt increasingly complex enterprise networks, incorporating a variety of hardware, software applications, operating systems, and networking protocols. ***If*** we fail to effectively anticipate, identify, and respond to rapidly evolving technological and market developments in a timely manner, our business will be harmed.
>
> …Our investments in research and development, including investments in AI, may not result in design or performance improvements, marketable products, subscriptions, or features, or may not achieve the cost savings or additional revenue that we expect.
>
> … While we have historically been successful in developing, acquiring, and marketing new products and product enhancements that respond to technological change and evolving industry standards, we ***may*** not be able to ***continue*** to do so, and there can be no assurance that our new or ***future offerings*** will be successful or will achieve widespread market acceptance. If we fail to accurately predict and address end- customers' changing needs and emerging technological trends in the enterprise security industry, including in the areas of AI, mobility, virtualization, cloud computing, and software-defined networks, our business could be harmed.

162. These risk disclosures failed to alert the market that Palo Alto's sales had already slowed and that the Company's new offerings were not achieving market acceptance. Sales were slowing by this point and the Company was developing an overhaul of its platformization strategy, which would harm the business to the tune of an estimated $600 million hit to billings.

**The Truth Emerges**

163. On February 20, 2024, Palo Alto Networks issued a press release, filed on Form 8-K with the SEC, which announced that the Company had drastically reduced its billings guidance for the third quarter of 2024 and full FY 2024, reporting expected total billings growth of 2-4% and revenue growth of between 13-15% for the third quarter, and billings growth of just 10-11% and revenue growth of 15-16% for FY 2024.

164. During a conference call with analysts held the same day, Defendant Arora revealed the Company's lowered guidance was a result of accelerated platformization and consolidation and "activating our AI leadership," as well as deals with the federal government failing. As he told an analyst: "just to be clear . . . from a billings perspective, part of the billings guidance is related to the Fed . . . part of it is also because of the platform initiatives -- platformization initiatives per se, but also part of it is we just expect there to be more deferred payments like annual billings, things like that as we roll out these programs. That's what makes it up."

165. During the call, Defendant Arora stated in his opening remarks, "Our guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership."

166. Defendant Arora explained "we're beginning to notice customers are facing spending fatigue in cybersecurity." Defendant Arora continued, explaining that Palo Alto's competitors had begun to lower prices, often "resorting to uneconomic pricing" to retain customers, therefore thwarting platformization efforts.

167. Defendant Arora revealed that selling customers on the idea of platformization therefore required not just allowing them to defer payments, but to have discounts and lengthy

periods of time in which they would be using multiple Palo Alto products for free before billing even started, and that "[o]ver the last 6 months," Palo Alto had been "quietly developing programs" to overhaul its platformization strategy:

> We believe we can build customer confidence in our platforms by approaching them well before their point product contracts expire. After we gain their contractual commitment, we have offered an extended rollout period where we can demonstrate our ability to deliver these platform benefits. Customers can then start paying us after the obligation of legacy vendors ends.
>
> *    *    *
>
> We expect a typical customer entering into a platformization transaction will not pay us for our technology for a period of time.

168. Defendant Golechha expanded on the discounts Palo Alto was being forced to give to induce customers to embrace platformization:

> For the customer, they are able to execute on the platform deployment with lower risk and consolidate vendors while benefiting from a lower cost -- total cost of ownership and the better security posture. As Nikesh [Arora] gave you the high-level trajectory in our pipeline, I want to help you understand how we think about the medium term. Our platformization offers to drive consolidation effectively provide customers a period of the contract for free as part of their commitment. We expect we may see a period of 12 to 18 months of pressure on our top line growth rate, notably billings.

169. Analysts homed in on the surprising news that Palo Alto was finding it necessary to offer discounts to sell customers on platformization, which it had advertised as a win-win. JP Morgan Chase analyst Brian Lee Essex asked: "one thing that caught my ear was the comment about discounting or offering a free period upfront for a certain period of time. Wanted to get a sense of what kind of headwind within that billings guidance is attributable to some of that discounting?" Defendant Arora replied:

> I think let me clarify in terms of the discounting notion. What's happening today is when I go to a customer and say, listen, I'd like to replace your estate with the entire platform. The customer says, 'Wait, wait a minute, I got this vendor for IPS, this for SD-WAN, this for SSC. And I got half of my firewalls from another

> vendor, and they all expire at different points in time. I'd love to deploy Zero Trust but it's going to take me 2, 3 years as the end of life, so these vendors happen. And I'm scared that if I rip and replace this at this point in time, is going to create execution risk, not just that, it's going to hit economic risk.'
>
> So the propositions we're going to customers is, listen, let's lay out a 2-year, 3-year cybersecurity consolidation and platformization plan. We'll go start implementing today, you pay us when they're done. So what it is, is more of a sort of like you can use our services until you have to keep paying the other vendor, we'll take it from there. But that's taking away a lot of the economic exposure and the execution risk for our customers. ***Now you can call that discount or you can call that a free offer. Our estimate is approximately it works out at about 6 months' worth of free product capabilities to our customers on a rolling basis.*** I think in about 12 months, as our offers start lapping each other, we should go back to our growth rate we've been talking about. And I think the right metric is the time frame is to look at RPO.

(emphasis added).

170. Defendant Arora also attributed a portion of the billing weakness to federal government projects. Defendant Arora revealed that Palo Alto "did see softness in the U.S. Federal Government market" and therefore experienced "billing weakness in Fed." U.S. federal government deals for several large projects "did not close" and resulted in "a significant shortfall in our U.S. federal government business" that is expected to continue into the third and fourth quarters of 2024. Defendant Arora further claimed that this "situation started off towards the end of Q1" and "worsened in Q2." Defendant Golechha further explained:

> We had some puts and takes during the quarter related to billings. As Nikesh [Arora] mentioned, we saw weakness in the U.S. federal vertical related to some specific programs. This U.S. federal weakness was a meaningful headwind to our billings in Q2 after we saw a slow start in the year to Fed. The impact of the federal deals on our revenue is significant as they are relatively shorter than our average contract term.

171. When an analyst expressed surprise about the softness in federal spending and asked for more information on the causes, Arora explained:

> As you are aware, there was a large program. We were part of down selected to be the only vendor. We'd expected and we staffed it to make sure we could

> implement it and we could get the orders. That program didn't materialize at the pace and at the spending levels we had expected. We saw an early glimpse in Q1 towards the end, we saw it not show up in Q2, and we have it staffed for Q3 and Q4. Remember, Fed is a lower duration number. So it has a much more significant impact to revenue because Fed pays on an annualized basis as opposed to a TCV [total contract value] basis.
>
> So you're seeing the impact of that to our revenue for Q3 and Q4 and some of the billings miss in Q2, which we had to make up with shipping from non-product backlog.

172. Many analysts – including Barclays, KeyBanc, William Blair, and Wells Fargo – understood the "large program" to refer to Thunderdome.

173. On this news, the price of Palo Alto common stock declined by $104.12 per share, or approximately 28%, from $366.09 per share on February 20, 2024, to close at $261.97 on February 21, 2024. This was the worst trading day in Palo Alto Networks' 12-year history as a public company.

174. As one observer summarized Palo Alto's "horrendous" new guidance and outlook in an article posted on *Seeking Alpha* on February 21, 2024: "The company apparently feels the need to help customers transition from point products to the platformization concept with financial incentives of sharing the costs to end legacy contracts, including not charging customers for a period of time. . .. Palo Alto has to provide customers incentives in what was supposed to be overflowing AI demand."

175. In a research note issued on February 20, 2024, Barclays analysts called the billings cut "unexpected" and estimated that "about half [of the $600M billings cut] is from the US Federal 'Thunderdome' project." Barclays wrote: "[W]e think PANW was assuming some contribution from the US Defense Information Systems Agency (DISA), for a project around zero-trust network architecture referred to as 'Thunderdome.' We estimate the contribution from

this project in FY24 was in the few hundred million range, which means that potentially half of this guidance revision was from this large project that has been pushed out."

176. Wells Fargo analysts also released a research note on February 20, 2024, explaining that the "$1.86B Thunderdome contract … did not materialize as expected," leading to the lowered billings.

177. Another fundamental contributor, according to the February 20, 2024 Barclays note: "PANW's explanation around free trials to reduce friction in platform deals and prevent customers from double-paying makes sense on paper … but until we see examples of this, the debate will be 'is this giving it away for free?' or 'is this short-term pain for long-term gain?' and the issue is this big of a change is being done unexpectedly in the middle of the year." Barclays called Arora's and Golechha's announcement that Palo Alto was offering discounts to customers while their legacy contracts with other vendors were still in effect "the part of the call that was most unexpected" and estimated it contributed to $600 million of the cut to Fiscal Year 2024 billings.

178. Several other analysts reacted with surprise and disappointment to the news that Palo Alto was finding it necessary to offer discounts to support its platformization strategy. Piper Sandler lowered its rating of Palo Alto from overweight to neutral, explaining that the need to offer customers free products while their legacy contracts expired would "negatively impact the business for 12-18 months - eliminating $600M from billings estimates in the back half of this year."

179. Guggenheim wrote the same day, February 20, 2024, that Palo Alto attributed the guidance cut to "a strategic shift to a new word called 'platformization,' which when described sounds like what they've been doing all along." Guggenheim further noted: "this raises

questions: (1) Why does PANW have to do this when other companies embark on similar paths of consolidation without having to give away product for a time, but they instead increase revenue from the start – CRWD comes to mind. (2) Why drop this major change on a quarterly conference call when results are weak? Why didn't they do it at their Friday night call in August?"

**Defendant Arora's Illicit Insider Sales**

180. During the Relevant Period, as Defendants promoted the Company's stock through false and misleading statements, Defendant Arora capitalized on the artificially inflated stock price by selling portions of their holdings of Palo Alto Stock.

181. Specifically, during the Relevant Period, Defendant Arora sold 555,240 shares of Palo Alto stock for proceeds of approximately $160,250,210. The sales took place over a period of five separate dates in less than a month between November 22, 2023, and December 12, 2023. The sales made by Defendant Arora during the Relevant Period were suspicious in timing and amount and were inconsistent with their pre- and post-Relevant Period trading practices.

182. In each transaction during the Relevant Period, Defendant Arora exercised an option to acquire Palo Alto shares at a price of $66.17 per share, and immediately sold the entire allotment in a single day. In SEC filings dating back to June 2018, Defendant Arora had ***never*** exercised and sold options in this manner with the exception of one date, June 7, 2023, just two months prior to the start of the Relevant Period. Until June 2023, Arora had ***never*** sold more than 60,000 shares in a two-month period (excluding sales denoted as made to satisfy tax obligations), let alone less than four weeks. Defendant Arora's trades during the Relevant Period are as follows:

| Date | # Of Shares Acquired at $66.17 | Total Cost of Acquired Shares (Rounded) | # Of Shares Sold | Average Price of Shares Sold (Range) | Total Revenue from Shares Sold (Approx.) | Net Profit (Approx.) |
|---|---|---|---|---|---|---|
| Nov. 22, 2023 | 40,848 | $2,702,777 | 40,848 | $266.55 to $268.07 | $10,909,267 | $8,206,491 |
| Nov. 24, 2023 | 30,678 | $2,029,862 | 30,678 | $266.15 | $8,164,827 | $6,134,965 |
| Nov. 27, 2023 | 178,474 | $11,809,036 | 178,474 | $267.06 to $269.02 | $47,865,346 | $36,056,310 |
| Dec. 11, 2023 | 5,240 | $346,714 | 5,240 | $300.01 | $1,572,060 | $1,225,347 |
| Dec. 12, 2023 | 300,000 | $19,850,010 | 300,000 | $300.44 to $307.32 | $91,738,710 | $71,888,700 |
| **TOTAL:** | 555,240 | $36,738,399 | 555,240 | $266.55 to $307.32 | $160,250,210 | $123,511,812 |

183. Prior to November 22, 2023, Arora held 866,395 shares of Palo Alto stock. His holdings did not substantially change due to the in-and-out nature of the transactions, however the 555,240 shares that he sold during the Relevant period were equivalent to 64% as many shares as Aurora held before and after the Relevant Period sales.

184. Further, Defendant Arora made all of these sales between November 22, 2023, and December 12, 2023 – approximately two months prior to the reveal to the public that the "platformization" strategy would include offering some of the Company's products/services for free, thus taking advantage of non-public information to capitalize on the Company's stock price.

**DAMAGES TO THE COMPANY**

185. Palo Alto has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, Palo Alto has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b. substantial loss of market capital;

c. costs already incurred and to be incurred defending the pending securities fraud class action lawsuit pending before this Court captioned *Schlaegel v. Palo Alto Networks, Inc.*, Case No. 3:24-cv-01156-CRB (N.D. Cal.); and

d. any fines or other liability resulting from the Company's violations of federal law.

186. In addition, Palo Alto's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

187. The wrongdoing complained of herein has irreparably damaged Palo Alto's corporate image and goodwill. For at least the foreseeable future, Palo Alto will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Palo Alto's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

188. Plaintiff brings this action derivatively in the right and for the benefit of Palo Alto to redress injuries suffered, and to be suffered, by Palo Alto as a direct result of violations of federal securities laws and breaches of fiduciary duties by the Defendants. Palo Alto is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189. The Board of Palo Alto, at the time this action was commenced, consisted of Defendants Arora, Zuk, Bawa, Donovan, Eschenbach, Goetz, Key, McCarthy and Twohill, and related party non-defendants Hamers and Thorning-Schmidt a total of eleven (11) individuals.

190. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Palo Alto Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

191. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

192. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Arora Because His**
**<u>Principal Professional Occupation as the Company's CEO</u>**

193. Defendant Arora joined the Company as CEO in June 2018 and has remained in that position since. Defendant Arora is also the Chairman of the Board. In his role as CEO of the Company for the fiscal years of 2023 and 2024, Defendant Arora received $151,425,203 and $58,036,875 in total compensation, respectively. The Company does not claim that Defendant

Arora is an independent director and because his primary source of income and primary employment is his employment as Chairman and CEO of Palo Alto and his professional reputation is inextricably bound to his role at Palo Alto Defendant Arora is incapable of acting independently and demand is futile upon him.

194. Due to Defendant Arora's position as Company CEO and Chairman of the Board, it is reasonably to infer that due to the importance of the Company's sales revenue and billing growth to the Company's financial position, Defendant Arora would have been aware of the decline in demand for Company's product, the rising level of competition in their field, and the Company's plan to implement the platformization strategy requiring providing services for free to incentivize growth.

195. Additionally, Defendant Arora is named as a defendant in the pending Related Securities Action. Accordingly, he is incapable of considering a demand to commence and vigorously prosecute the claims asserted in this Action with the required independence and disinterest.

196. Lastly, making a demand on Defendant Arora would be a futile and useless act as Defendant Arora directly benefitted from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with his insider illicit stock sales detailed herein and cannot possibly consider a demand to sue himself based on those transactions from which he reaped significant benefits.

197. Defendant Arora made such illicit trades during the Relevant Period by wrongfully benefitting from the Company's artificially inflated stock price at the expense of the Company's shareholders. Throughout the Relevant Period, Defendants misled the investing public regarding the true business prospects of the Company. When the truth finally emerged, the

Company's stock plummeted, but only after Defendant Arora had substantially benefitted by selling significant portions of his stock at higher prices.

198. The Company has adopted an Insider Trading Policy (the "Insider Policy") to provide guidance with respect to the trading of the Company's securities. The Insider Policy provides that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

199. As a result, Defendant Arora has violated the Company's Insider Policy and faces a substantial likelihood of liability due to his illicit trades, rendering him interested in considering demand.

**Demand is Futile as to Audit Committee Defendants**

200. Demand is futile as to Defendants Bawa, Goetz, Key, and McCarthy (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill her responsibilities.

201. The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties of the Audit Committee are set forth herein, *supra*.

202. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

203. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material

information concerning the Company's future growth plans including the platformization strategy (including the plan to provide product for free), as well as their expected revenue with "Project Thunderdome" which did not materialize in the expected way presented to investors. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

204. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

205. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

206. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material

omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

207. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

## Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

208. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

210. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

211. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose to investors that: (i) the upcoming platformization strategy would include changes such as offering Palo Alto products/services for free; (ii) Palo Alto was aware that certain revenue from government contracts would take an extended period of time to acquire; (iii) as a result of the foregoing, the financial strength of Palo Alto was significantly less financially appealing than claimed; (iv) accordingly, Palo Alto's commercial and financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times. Furthermore, the 2023 Proxy Statement falsely represented that the board was conducting appropriate risk oversight.

212. The 2023 Proxy Statement was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

213. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of the Company's directors.

214. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

215. Plaintiff on behalf of Palo Alto has no adequate remedy at law.

**COUNT II**

**Against the Securities Action Defendants for**
**Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217. As a result of the conduct and events alleged above, Palo Alto has been named as a defendant in the Related Securities Action brought on behalf of Palo Alto shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

218. Federal law provides Palo Alto with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Palo Alto has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Palo Alto to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

219. Accordingly, Plaintiff, on behalf of Palo Alto, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Palo Alto under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Palo Alto.

220. Palo Alto claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

221. Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Palo Alto securities during the Relevant Period.

222. The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Palo Alto securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

223. The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

224. The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

225. When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Palo Alto, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

226. Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Palo Alto were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Palo Alto.

**Allegations Regarding the Securities Action Defendants as Control Persons**

227. In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Palo Alto in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were, able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

228. The Securities Action Defendants were "controlling persons" of Palo Alto within the meaning of Section 20(a) of the Exchange Act, and, accordingly, Defendant Tangney could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

229. Plaintiff hereby derivatively claims such right of contribution on behalf of Palo Alto.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

230. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

231. The Individual Defendants owed and owe Palo Alto fiduciary obligations. By

reason of their fiduciary relationships, the Individual Defendants owed and owe Palo Alto the highest obligation of good faith, loyalty, and due care.

232. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Palo Alto shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

233. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Palo Alto to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Palo Alto and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

234. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235. Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

## COUNT IV

## Against all the Individual Defendants for Unjust Enrichment

236. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

237. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Palo Alto.

238. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Palo Alto.

239. Plaintiff, as a shareholder and representative of Palo Alto, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

240. Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Abuse of Control**

241. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242. The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Palo Alto and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

243. As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

244. Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

**COUNT VI**

**Against the Individual Defendants for Gross Mismanagement**

245. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

246. The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

247. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

248. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Palo Alto's affairs and in the use and preservation of Palo Alto's assets.

249. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Palo Alto to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Palo Alto, thus breaching their duties to the Company.

250. As a result, the Individual Defendants grossly mismanaged Palo Alto and should be liable to the Company for the resulting damages.

## COUNT VII

## Against Defendant Arora for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information

251. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

252. Defendant Arora, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public. Defendant Arora engaged in this course of conduct to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

253. This proprietary, non-public information concerning the Company's business and prospects was known by Defendant Arora, who sold substantial amounts of his shares of Palo Alto stock during the period that the Defendant's fraud was ongoing. These sales were made for Defendant Arora's own self-interests, at the expense of Palo Alto and the investing public.

254. By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, Defendant Arora breached his fiduciary duties of good faith and loyalty to the Company.

255. As such, Defendant Arora is legally responsible to the Company for the significant profits they received from his sales of stock in Palo Alto.

## COUNT VIII

## <u>Against the Individual Defendants for Waste of Corporate Assets</u>

256. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

257. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

258. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against Related Securities Action.

259. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

260. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Palo Alto and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to Palo Alto the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing Palo Alto and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Palo Alto and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to Palo Alto exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding Palo Alto restitution from Defendants, and each of them;

F. Awarding Palo Alto contribution from the Securities Action Defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: March 5, 2025

Respectfully submitted,

*/s/ Ryan M. Ernst*

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Main: (302) 803-4600
Direct: (302) 321-5411
rernst@bk-legal.com

*Attorneys for Plaintiffs*

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
jlifshitz@lifshitzlaw.com